**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CRIMINAL ACTION NO. 19-77-DLB-CJS**

**UNITED STATES OF AMERICA**                                                            **PLAINTIFF**


**v.**                                          **REPORT AND RECOMMENDATION**


**DONTEZ JUSTICE**                                                                        **DEFENDANT**

\*\*\*    \*\*\*    \*\*\*    \*\*\*

Defendant Dontez Justice moves to suppress evidence that he argues was illegally seized

from him.  (R. 39, Page ID 128; *see* R. 19).  The Government opposes the motion.  (R. 43).  The

Court held an evidentiary hearing on June 12, 2020.  (*See* R. 48, Minute Entry).  Afterwards,

Justice was given the opportunity to file a reply brief, but he declined.  (R. 47; 48).  Accordingly,

the motion is ripe for consideration and preparation of a Report and Recommendation.[1]  *See* 28

U.S.C. § 636(b)(1)(B).  For the reasons given, it will be recommended that Justice's motion to

suppress **be denied**.

I.      **BACKGROUND**

Justice's Indictment, as superseded, charges him with knowingly and intentionally

possessing with intent to distribute five grams or more of methamphetamine, in violation of 21

U.S.C. § 841(a)(1).  (R. 16).  The charge arises from the stop of Justice's vehicle on October 17,

2019, and his subsequent arrest after law enforcement searched his person and discovered

methamphetamine.  Justice's initial Motion to Suppress challenged the constitutionality of the stop

---

[1] *See United States v. Quinney*, 238 F. App'x 150, 152 (6th Cir. 2007) (citing *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) (characterizing a motion to suppress as dispositive)).

of his vehicle and the search of the vehicle and his person.  (*See* R. 19, Page ID 46-49).  However, he has since amended his motion, withdrawing his attack on the constitutionality of the stop, instead challenging only the legality of the search of his vehicle and person. (R. 39, Page ID 126). The Government argues that the searches were supported by probable cause and thus were legal. (R. 43).

## II.    FACTUAL FINDINGS

The investigation into Justice's alleged distribution of methamphetamine arose from a separate drug investigation.  Matt Day, a task force officer with the DEA, testified at the evidentiary hearing that on October 17, 2019, Deputy Melton with the Boone County Sheriff's Office conducted a traffic stop of a vehicle in Boone County.  The female passenger in the vehicle was ultimately arrested for trafficking in methamphetamine.  She indicated to Deputy Melton her willingness to discuss what she knew about illegal drug activity in the area.  Deputy Melton contacted Officer Day, asking him if he would like to speak with the passenger.  Officer Day agreed.[2]

The passenger, now turned confidential informant (CI), revealed that she had bought drugs from a dealer she knew as "Monnie" at least twenty times in the last eight months, buying anything from an eight ball (a little over three grams) to two ounces.  Her most recent purchase was for an eight ball and occurred the day before, October 16, 2019.  She described Monnie as a black man with long dreads, said that he drove an aqua teal car, and provided his phone number.  She allowed Officer Day to look at her cellphone, which corroborated a drug transaction for an eight ball with Monnie on October 16, 2019, at a BP gas station in Florence, Kentucky.

---

[2] Officer Day also spoke with the driver of the vehicle, but he offered no information that is relevant to this case.

Officer Day asked the CI if she were willing to cooperate in helping law enforcement to set up a drug deal with Monnie, i.e., a controlled buy; if she were, she would receive consideration for her criminal charges. Officer Day emphasized that he told her that she would still be going to jail that night and that he made no promises to her about what specifically would happen based upon her cooperation. She agreed to cooperate and placed a controlled recorded call to Monnie asking him if he was "good." He stated he was and asked how much she needed, with her responding "two." Officer Day testified that this meant there was a deal between the CI and Monnie for the CI to buy two ounces of methamphetamine. The CI and Monnie agreed to conduct the transaction at a McDonald's in Crescent Springs, Kentucky, a location where they had met before.[3] According to Officer Day, the plan was to have the CI identify Monnie when he arrived at the McDonald's. The CI would then contact Monnie to change the meeting location, at which point local law enforcement would conduct a traffic stop of Monnie's vehicle. Officer Day described this as a "buy-bust." He wanted to handle the controlled buy this way, rather than allowing the actual drug transaction to occur, because he did not have money to make the exchange. Officer Day recruited other officers to participate in the controlled buy, with the investigation eventually including officers from the DEA, Villa Hills Police Department, and Covington Police Department.

Officer Day testified that the vehicle he and the CI were in was positioned across from the McDonald's. Officer Day elaborated that the CI saw someone in the McDonald's parking lot that she thought was Monnie. Officer Day proceed to drive through the lot to determine whether it was Monnie; at that same time, the CI observed a different person driving by in a teal Chevy Impala. She identified this person as Monnie, stating she was absolutely certain that it was him. Officer

---

[3] Officer Day testified that he thought there were two or three controlled calls that day along with text messages.

Day drove his vehicle back across the street from the McDonald's and they continued to observe Monnie in the McDonald's parking lot.  Officer Day had the CI call Monnie, telling him that her car had broken down at the nearby Kremer's Market.  Around this time, Officer Day relayed to the other assisting officers that the CI had positively identified Monnie.  The last thing Officer Day observed was Monnie pull out of the McDonald's parking lot and head towards Kremer's Market with the unmarked police vehicle of Officer John Mairose, a DEA task force officer based out of the Covington Police Department, following him.

Officer Mariose also testified at the evidentiary hearing.  He stated that Officer Day called him on the day of the controlled buy and asked him to assist in a drug investigation.  He agreed and contacted officers from Covington and Villa Hills police departments.  He explained that part of the reason he asked for their assistance was because he had an unmarked vehicle with no emergency equipment; he wanted a marked police vehicle if it became necessary to stop the vehicle involved in the controlled buy.  The other officers agreed to assist, and Officer Mariose arrived at the McDonald's, positioning himself in the parking lot.  He was alerted after Monnie arrived that the CI had identified him; he observed Monnie through his mirror until Monnie left the parking lot.  He followed Monnie out of the parking lot but eventually stopped tailing him because he did not want Monnie to know that he was being followed.  He radioed other officers, noting Monnie's direction of travel, and heard Officer Tyler Brockman, an officer with the Villa Hills Police Department, report that his vehicle was behind Monnie's vehicle in traffic.

Officer Brockman also testified.  He stated that someone from his department informed him about a DEA request for help in an investigation.  He met with Officer Kyle Warner of the Covington Police Department and Officer John Carl of the Villa Hills Police Department to find out more.  He stated that he learned that other officers had used a CI to set up a controlled buy of

4

methamphetamine and they were going to need a "whisper stop." He described a whisper stop as a situation where law enforcement believes that probable cause to stop a person for some type of investigation has been established, but where a traffic stop of the individual is instead initiated for reasons unrelated to the investigation. He said this is done so that the individual does not know that officers are otherwise investigating him. Officer Brockman testified that his role, along with other officers, was to position themselves in different areas so that they could conduct a traffic stop of the suspect, Monnie, depending on the route he ultimately took. Brockman further testified that he was instructed to develop his own probable cause for a traffic stop. Accordingly, Officer Brockman positioned himself near an overpass by the McDonald's where the drug transaction was set to occur. He heard a person whom he believed was a DEA agent say over the radio that Monnie had pulled into the McDonald's and they would alert once the suspect left. He remembered next hearing that Monnie had left McDonald's and was going to turn westbound onto Buttermilk Pike. Knowing that he had positioned his vehicle other than in Monnie's direction of travel, Brockman left his location to try to locate Monnie's vehicle. He located it traveling westbound on Buttermilk Pike. He testified that Monnie's vehicle was on a slight downward slope and had another officer's vehicle traveling behind it. Monnie had moved over into a left-turning lane, and Brockman observed that as Monnie's vehicle moved into the turn lane, no left lane change signal was used. Monnie's vehicle then abruptly switched from the left-turning lane back to the lane to continue straight on Buttermilk Pike, again not using a signal when doing so, to Officer Brockman's recollection. Accordingly, Officer Brockman then initiated a traffic stop.

Monnie's vehicle did not immediately pull over but eventually did so near the Crescent Springs City Building on Buttermilk Pike. As Brockman exited his vehicle and approached the suspect's vehicle, he testified that he smelled a strong odor of marijuana. He asked Defendant

5

Justice, the driver and only person in the vehicle, to exit. Officer Brockman then conducted what he described as a "pat-down" of Justice, during which he felt something that he believed was marijuana in Justice's pocket.[4] He removed the item, placed Justice in handcuffs, and then sat him down nearby. Other officers had arrived on scene at that point, including Officer Warner. Officer Brockman proceeded to search Justice's vehicle, finding nothing of substance. Officer Brockman testified that, during this search, he was also observing Justice's reaction, concluding that Justice did not appear to be at all nervous. He took this as a sign that Justice had hidden drugs on his person.

Officer Brockman then again approached Justice to search him. As he was reaching around the "groin area," Justice became very agitated and started saying that Officer Brockman could not do this to him and was violating his rights. In an attempt to deescalate the situation, Officer Brockman handed him off to another officer to continue the search, Officer Warner.

Officer Warner, a canine officer with the Covington Police Department, also testified at the hearing. He continued with the search of Justice's person after Officer Brockman walked away. As he pulled on Justice's waistband, he saw a plastic bag, which he figured contained methamphetamine. He retrieved it and a second bag that he also believed contained methamphetamine. Officer Warner further testified that his canine partner, Holly, positively alerted to the smell of drugs coming from Justice's vehicle.

## III.    ANALYSIS

In considering Defendant's motion to suppress, Justice generally bears the burden of establishing that his Fourth Amendment rights were violated. *See United States v. Coleman,* 923 F.3d 450, 455 (6th Cir.), *cert. denied*, 140 S. Ct. 580 (2019) ("As the proponent of the motion to

---

[4] Later, during cross-examination, Officer Brockman seemed to agree that what he conducted was more similar to a search, rather than a pat-down.

suppress, Coleman 'bears the burden of establishing that the challenged search violated his Fourth Amendment rights.'") (quoting *United States v. Witherspoon,* 467 F. App'x 486, 490 (6th Cir. 2012)). While Justice must show that his Fourth Amendment rights were violated, "[t]he Government has the burden of proof to justify a warrantless search." *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002); *see United States v. Spaulding*, 446 F. Supp. 2d 789, 795-96 (N.D. Ohio 2006) ("Although the proponent of a motion to suppress generally bears the burden of establishing his or her Fourth Amendment rights were violated by a challenged search or seizure, it is the government's burden to demonstrate by a preponderance of the evidence that a particular seizure was based on either probable cause or reasonable suspicion.") (internal citations omitted).

### A.     Officers Had Probable Cause to Search Justice's Vehicle

Justice states in his Amended Motion to Suppress (R. 39) that he does not challenge the stop of his vehicle. "Based on the [']collective knowledge' doctrine Mr. Justice is withdrawing his constitutional attack on the stop of the automobile he was operating as it was believed that the shared knowledge between the federal agents and Villa Hills police provided probable cause to make a stop of the automobile." (R. 39, Page ID 126). Instead, he challenges only the search of his vehicle and the search of his person. (*Id.* at Page ID 126-28).[5] To meet its burden, the Government argues that the search of Justice and his vehicle was supported by probable cause. (R. 43, Page ID 149-53). Accordingly, the Court focuses its attention on whether officers had a valid basis to search Justice's vehicle and person, beginning with the search of his vehicle. *See United States v. Crumb*, 287 F. App'x 511, 513 (6th Cir. 2008) ("Thus, because there is no dispute

---

[5] As Justice recognizes, the drugs were found on his person, not in his automobile. "The only items collected as evidence in this matter was the small bag of marijuana removed from Mr. Justice's front pants pocket, a bag of methamphetamine recovered from inside Mr. Justice's boxer shorts, and Mr. Justice's cellular phone." (R. 39, Page ID 124).

that the initial stop of the vehicle was valid, the focus of our analysis is whether Officers Duffy and Mahon had probable cause to search the vehicle.").

The Fourth Amendment guarantees the right of the people to be secure in their persons against unreasonable searches and seizures. U.S. Const. amend. IV. "The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). But "there is an exception to this requirement for searches of vehicles." *Id.* Known as the "automobile exception, police officers may conduct a warrantless search of a vehicle if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)). "Probable cause to search a vehicle is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Lyons*, 687 F.3d 754, 764 (6th Cir. 2012) (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir.1998)). "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* This probable cause inquiry is a "commonsense, practical question," in which the court applies a "totality-of-the circumstances approach." *Illinois v. Gates*, 462 U.S. 213, 230 (1983).

Moreover, in considering whether officers had probable cause to search, the Court is not limited to considering only the information known by the particular officers who conducted the search. This is because "it is well-established that an officer may conduct a stop based on information obtained by fellow officers." *Lyons*, 687 F.3d at 765-66. This so-called collective knowledge doctrine "applies equally to traffic stops and to vehicle searches." *Id.* at 766 n.4. And it permits a court "to impute collective knowledge among multiple law enforcement agencies, even

8

when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop." *Id.* at 766.

Before applying these principles to this case, the Court briefly summarizes the circumstances leading to the search of Justice's vehicle. Officer Day received information from a confidential informant that a person called Monnie, later identified as Justice, had sold the CI drugs at least twenty times over the last eight months. The CI provided specific details about Monnie, including a physical description of him (a black man with long dreads), a description of his physical (an aqua teal) car, and his telephone number. She also detailed her latest drug purchase from Monnie, stating that she bought an eight ball from him at the Florence BP gas station the day before. Upon receiving this information, Officer Day did not take it at face value; rather, he checked the CI's call logs and text messages to corroborate the information she had provided. That very day, Officer Day had the CI arrange a controlled buy from Monnie of two ounces of methamphetamine at the McDonald's in Crescent Springs. Justice arrived at the McDonald's in a teal car, and the CI positively identified him as Monnie. Further, after the CI changed the location of the buy, officers observed Justice promptly leave the McDonald's and drive in the direction of the new meet location.

Applying commonsense and considering the totality of the circumstances summarized above, probable cause existed to search Justice's vehicle. First, "the CI's tip was corroborated by the officers' own observations [which helped provide] probable cause for the search of the automobile." *Lumpkin*, 159 F.3d at 986. Likewise, "the informant's arrangement of a controlled buy over the phone, and [Justice's] drive to the proposed drug deal location" provided "probable cause to believe [his] car contained contraband." *United States v. Arnold*, 442 F. App'x 207, 210-11 (6th Cir. 2011). After observing these activities and Justice leaving the McDonald's parking

lot soon after the CI changed the meeting location, "officers had little reason to think that they would not find contraband in that vehicle." *United States v. Welch*, 279 F. App'x 376, 378 (6th Cir. 2008).

Justice disagrees that probable cause existed to search his vehicle. But rather than arguing that the circumstances identified above do not rise to probable cause, he bases his attack on whether the odor of marijuana was present so as to permit Officer Brockman to search his vehicle upon traffic stop.

> While the stop of Mr. Justice's automobile was legitimate, the subsequent search was not legal. Officer[]s searched the automobile and claimed to have probable cause because of the smell of marijuana. The automobile did not smell like marijuana; the officers on scene merely claimed to smell marijuana as a mechanism to avoid the Fourth Amendment requirements.

(R. 39, Page ID 126).

This argument focuses on what was allegedly observed by Officer Brockman and occurred at the scene of the traffic stop—that is, detecting the odor of marijuana—as the only basis for probable cause. This focus is misplaced. It ignores that Officer Brockman testified that he had two bases for probable cause to search the vehicle—his smell of marijuana *and* his knowledge of the circumstances surrounding the controlled buy. Also, and more to the point, it does not matter what circumstances Officer Brockman subjectively believed gave him probable cause to search Justice's vehicle—all that matters is whether, from an objective standpoint, he had probable cause for the search. The United States argues that Officer Brockman had probable cause to search the car based on knowledge of the "buy-bust" circumstances (*see* R. 43, at Page ID 153 "Based on that knowledge [of the investigation and "buy-bust"], Brockman had probable cause to stop and search the car and to arrest the Defendant.").[6] The Court agrees. *See United States v. Hughes*,

---

[6] The Government points out that Officer Brockman's smelling of marijuana only increased his own level of suspicion about Justice. (R. 43, Page ID 153).

606 F.3d 311, 316 (6th Cir. 2010) ("In other words, if, at the time of the stop, Atnip had probable cause to believe that Hughes was violating one of the traffic ordinances or statutes raised by the government before the district court, then it simply does not matter whether Atnip intended to stop Hughes on the basis of that traffic violation or instead intended to stop Hughes because Atnip suspected that Hughes was preparing to commit a crime."); *see Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) ("Fourth Amendment reasonableness 'is predominantly an objective inquiry.' We ask whether 'the circumstances, viewed objectively, justify [the challenged] action.' If so, that action was reasonable 'whatever the subjective intent' motivating the relevant officials. This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts, and it promotes evenhanded, uniform enforcement of the law.") (internal citations omitted).    Thus, the circumstances surrounding the controlled buy establish probable cause to stop and search the vehicle, regardless of whether Officer Brockman detected the odor of marijuana.

**B.    Officers Were Permitted to Search Justice Incident to Arrest**

Justice next argues that, "[w]hile the Court may believe that there was probable cause to search the automobile . . ., there is no probable cause established to search Mr. Justice's person. And more importantly, there was no warrant exception for the warrantless search." (R. 39, Page ID 130). The Government argues that the search of Justice was permitted by the search incident-to-arrest doctrine. (R. 43, Page ID 149, 153).

"[W]arrants are generally required to search a person's home or his person." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). However, "[u]nder the 'search-incident-to-a-lawful-arrest' exception to the warrant requirement, a law enforcement officer may conduct a full search of an arrestee's person incident to a lawful custodial arrest." *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004). A prerequisite is that the arrest be supported by probable cause. *United*

11

*States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search . . . ."). Here, the Government points to the same information concerning the controlled buy as supplying probable cause to arrest Justice. (R. 43, Page ID 152-53).

To determine whether the warrantless arrest of Justice was permissible here, "[t]he question [the Court] must answer is 'whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Smith v. Thornburg,* 136 F.3d 1070, 1076 (6th Cir. 1998) (quoting *Donovan v. Thames*, 105 F.3d 291, 298 (6th Cir. 1997)); *also see United States v. Hensley*, 469 U.S. 221, 231 (1985) ("[W]hen evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who issued the flyer possessed probable cause to make the arrest."). Here, all of the same circumstances supporting the search of the vehicle also gave officers probable cause to believe that Justice was committing a criminal offense—the information provided by the CI, the corroboration of that information, Justice arriving at the location where a controlled buy was scheduled to occur, and him leaving that location promptly after being contacted by the CI and heading to a secondary meet location.

Justice questions that these circumstances were enough to establish probable cause to search Justice, stating that the credibility of the CI was unknown, that the officers heard no direct

conversations of a drug transaction, and that no drug transaction actually occurred. (R. 39, Page ID 132-33). However, none of these arguments is enough to counter the probable cause finding.

When Justice states that the credibility of the CI was "unknown," this seems to be an attack on the fact that the officers had only made contact with her on the date Justice was arrested. However, such is not fatal to the CI's credibility. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons." *Gates*, 462 U.S. at 232. "[A] deficiency in one [area] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. Although the CI had not worked with these officers before, the CI was a known person to officers, who could have been criminally prosecuted for making a false report, and thus her statements were entitled to more weight than those of a truly unknown person. *United States v. Stokes*, 742 F. App'x 947, 950 (6th Cir. 2018) (noting that known CI's statements are entitled to far greater weight than anonymous person's statements). Further the CI's personal participation in past drug transactions with Justice and the details she provided about those transactions increased her reliability. *See id.* at 951-52. And Agent Day testified that he corroborated the CI's details of her prior drug transactions with Monnie, which also increased the reliability of her information. *See id.* at 952. Considering all of this information, the Court cannot conclude that the CI's credibility was unreliable just because she never worked with officers before.

The lack of an explicit conversation about drug activity is likewise non-dispositive. It would certainly be more clear cut for probable cause purposes if the CI and Justice had agreed to "a sale of two ounces of methamphetamine" in the controlled call rather than Justice agreeing to

13

bring "two" of an unidentified substance. But, understandably, one would not expect illicit drug activity to be arranged in such a way. And more importantly, this Court must consider what "two" means in the totality of the circumstances. Given the CI's recitation of her specific prior drug transactions with Justice and Officer Day's corroboration of that information, "[t]hough the two used coded language, it is reasonable to believe that during this conversation, [Justice] agreed to bring drugs to [the CI]." *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020).

Justice's final argument—that no drug transaction actually took place—suffers a similar fate. While officers observing a drug transaction between Justice and the CI would have made probable cause for Justice's arrest stronger, the Fourth Amendment is only concerned with whether the circumstances that did occur are sufficient enough to amount to probable cause. *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) ("'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."). Accordingly, as there was enough probable cause to arrest Justice, it does not change the outcome that there could have been more.

Having determined that probable cause existed for Justice's arrest, we next turn to the search-incident-to-arrest doctrine. As an initial matter, Justice and the Government debate whether Officer Brockman's initial interaction with Justice, in which he retrieved marijuana from Justice's pocket, was a pat-down or a search. (*See* R. 39, Page ID 128; R. 43, Page ID 153). Similarly, they debate the timing of his arrest. The Government argues that he was arrested once Officer Brockman placed him in handcuffs after discovering marijuana in his pocket. (R. 43, Page ID 153). Justice argues that "[h]e was arrested after the illegal discovery of the methamphetamine. (R. 39, Page ID 131). Justice appears to believe that this sequencing is dispositive, pointing out

14

that he "was not arrested prior to or during the search of him. The discovery of the methamphetamine was not a search incident to arrest as the Defendant was not under arrest and not going to be placed under arrest. He was arrested after the illegal discovery of the methamphetamine." (R. 39, Page ID 131).

Implicit here is Justice's belief that an arrest must occur *before* a search to apply the search-incident-to-arrest doctrine. However, "[t]he search-incident-to-a-lawful-arrest rule also permits an officer to conduct a full search of an arrestee's person *before* he is placed under lawful custodial arrest as long as 'the formal arrest follow[s] quickly on the heels of the challenged search of ... [his person]' and the fruits of that search are not necessary to sustain probable cause to arrest him." *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004) (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 111, (1980)); *see United States v. Latham*, 763 F. App'x 428, 431 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 846 (2020), *reh'g denied*, No. 19-5596, 2020 WL 1906747 (U.S. Apr. 20, 2020) (collecting cases noting that arrest not need precede a search).

Review of Defense Exhibit 1, which was admitted at the evidentiary hearing and contains Officer Brockman's body camera footage from the time he pulled Justice over until his arrest. Putting aside the dispute of whether Officer Brockman's interaction with Justice, in which he discovered marijuana in his pocket, was a search or a pat-down, the encounter ended around the 2 minute 13 second mark of the video. Similarly, putting aside the dispute as to whether Justice was under full custodial arrest at this time, the footage reveals that Officer Brockman next searched Justice's vehicle, eventually returning to search Justice's person again at the 8 minute 55 second mark. As Officer Brockman conducts this search, Justice becomes agitated, and so Officer Warner

takes over the search, finding methamphetamine tucked down inside Justice's pants.  Justice was then arrested.[7]

The question, then, is whether the delay between the two searches (about six and a half minutes) means that the search-incident-to-arrest doctrine does not apply?  Courts making similar inquiries have noted that the focus is "not strictly on the timing of the search but its relationship to (and reasonableness in light of) the circumstances of the arrest."  *United States v. Smith*, 389 F.3d 944, 951 (9th Cir. 2004).  Sometimes, a search "may be conducted well after the arrest, so long as it occurs during a continuous sequence of events."  *Id.*

Here, the sequence of events demonstrates that "the actual arrest was [not] too remote from the search."  *United States v. Lugo*, 170 F.3d 996, 1003 (10th Cir. 1999).  After Brockman found the marijuana on Justice, he immediately began searching his vehicle, before again immediately resuming the search of Justice that led to his arrest.  This sequencing demonstrates that this is not a case where "the arrest and search are so separated in time or by intervening events that the latter cannot fairly be said to have been incident to the former."  *United States v. Abdul-Saboor*, 85 F.3d 664, 668 (D.C. Cir. 1996).  Rather, the short delay here between the initial search and the follow-up search were "substantially contemporaneous with the arrest."  *Shipley v. California*, 395 U.S. 818, 819 (1969) (quoting *Stoner v. State of California*, 376 U.S. 483, 486 (1964)).

Moreover, the fruits of the searches of Justice's person, the marijuana and methamphetamine, "are not necessary to sustain probable cause to arrest him."  *Montgomery*, 377 F.3d at 586.  As has been determined, the circumstances surrounding the controlled buy were sufficient to establish probable cause that Justice was committing or about to commit a crime so

---

[7] Justice does not dispute that he was under arrest after the discovery of the methamphetamine. (*See* R. 39, Page ID 125 ("The illegal discovery of methamphetamine le[]d to the arrest of the defendant.); Page ID 131 (Justice "was arrested after the illegal discovery of the methamphetamine.")).

as to justify his arrest.  Accordingly, given the timing and continuous nature of events between the

search and Justice's arrest and the determination that neither the marijuana nor methamphetamine

are needed to justify the probable cause for his arrest, the Court concludes that the search-incident-

to-arrest doctrine applies here even though Justice may have been searched before he was arrested.

*See United States v. Torres-Castro*, 374 F. Supp. 2d 994, 1013 (D.N.M. 2005), *aff'd*, 470 F.3d 992

(10th Cir. 2006) ("Under this principle, a delay of three to five minutes between the arrest and the

search does not necessarily preclude a finding that the search was incident to the arrest, so long as

the search and arrest are related in 'a continuous sequence of events.'") (quoting *United States v.*

*Smith*, 389 F.3d at 951); *see also Barnes v. Harrison*, No. EDCV 05-1092 ODW JC, 2011 WL

1532401, at *21 (C.D. Cal. Feb. 17, 2011), *report and recommendation adopted*, No. EDCV 05-

1092 ODW JC, 2011 WL 1527950 (C.D. Cal. Apr. 20, 2011) ("Since petitioner was arrested within

minutes of the search, based on an arrest warrant unrelated to the fruits of the challenged search,

no Fourth Amendment violation occurred.").[8]

## IV.    CONCLUSION AND RECOMMENDATION

The evidence and testimony presented at the evidentiary hearing, as well as the evidence

set forth in the record, demonstrate that Justice's constitutional rights were not violated such that

suppression is warranted.

Accordingly, for the reasons stated, **IT IS RECOMMENDED** that:

---

[8] In his Amended Motion to Suppress, Justice cites the part of Officer Brockman's body-cam footage after the discovery of marijuana, in which Officer Brockman states that Justice "is not under arrest but is being detained." (R. 39, Page ID 131).  To the extent that Justice argues that Officer Brockman's subjective intention to arrest or not arrest him at this time has some bearing on the search-incident-to-arrest doctrine, it does not.  *See United States v. Diaz*, 854 F.3d 197, 209 (2d Cir. 2017) ("Officer Aybar's search of Diaz was a valid search incident to an arrest, despite the fact that she did not intend to arrest him when she began the search."); *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) ("Whether or not the officer intended to actually arrest the defendant at the time of the search is immaterial to this two-part [search-incident-to-arrest] inquiry.").

1)      Justice's Motion to Suppress (R. 19) **be denied as moot** in light of Justice's filing of an amended suppression motion; and

2)      Justice's Amended Motion to Suppress (R. 39) **be denied.**

Specific objections to this Report and Recommendation must be filed within fourteen (14) days of the date of service or further appeal is waived.  28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2); *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984), *aff'd*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated this 16th day of July, 2020.



Signed By:

_Candace J. Smith_

United States Magistrate Judge

J:\DATA\Orders\criminal cov\2019\19-77-DLB-CJS Justice Suppression R&R.mb.docx